IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JANELLE C.,                )
                         )
           Plaintiff,       )
                         )
        v.             )      1:24CV390
                         )
FRANK BISIGNANO,        )
Commissioner of Social Security,[1]  )
                         )
         Defendant.      )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Janelle C. ("Plaintiff") brought this action pursuant to Sections 205(g) and

1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and

1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security

denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-

motions for judgment, and the administrative record has been certified to the Court for review.

I.     PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on May 23, 2018, alleging a

disability onset date of January 9, 2017 in both applications. (Tr. at 15, 273-83.)[2] Her

applications were denied initially (Tr. at 62-103, 144-53) and upon reconsideration (Tr. at 104-

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

43, 158-76). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 178.) On May 4, 2021, Plaintiff, along with her attorney, attended the telephone hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 15, 36-61.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 29), and on January 7, 2022, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

Plaintiff filed a claim in this Court on March 11, 2022, seeking review of the Commissioner's decision. (See Case No. 1:22CV193.) The Commissioner ultimately moved to remand the case to the agency (Tr. at 2565-72), and on December 14, 2022, the Court granted the Commissioner's Motion (Tr. at 2573-75). The Appeals Council then remanded the case to the ALJ, noting that the prior decision did not provide "an adequate evaluation of [Plaintiff's] symptoms, particularly those related to fibromyalgia and pain." (Tr. at 2578.) On August 30, 2023, Plaintiff and her attorney attended the hearing on remand by telephone. (Tr. at 2463.) Both Plaintiff and an impartial vocational expert again testified. (Tr. at 2463, 2507-41.) In a decision issued January 23, 2024, the ALJ concluded that Plaintiff was not disabled as defined by the Act between January 9, 2017 and the date of the decision. (Tr. at 2496.) Plaintiff subsequently filed the action now before the Court.

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144

(4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 9, 2017. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 2466.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> bipolar affective disorder; social anxiety disorder; borderline personality disorder; post-traumatic stress disorder; chronic pain syndrome; fibromyalgia; degenerative disc disease of the lumbar spine; degenerative joint disease of the right knee; and headaches[.]

(Tr. at 2466.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 2467-72.) The ALJ therefore assessed Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

> [Plaintiff] can occasionally engage in stooping, kneeling, crouching, crawling, and balancing, with standing and walking on even terrain; and occasional climbing of stairs and ramps, but cannot climb ropes, ladders, or scaffolds. She can make occasional use of foot pedals; can occasionally reach overhead; and can perform frequent handling and fingering. [Plaintiff] should avoid concentrated exposure to hazards such as moving machinery and unprotected heights. She can have exposure to moderate noise levels or less and can perform no driving of an automobile for the completion of job tasks. She can understand, remember, and carry out simple instructions. They can be detailed but not complex. She can focus on tasks for two hours at a time, learned by demonstration in 30 days or less. She can have no contact with the public but occasional contact with coworkers and supervisors; can manage routine changes in her work environment; and can have no specific work quotas.

(Tr. at 2472.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 2494-95.) However, the ALJ found at step five that, given Plaintiff's age,

6

education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 2495-96.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 2496.)

Plaintiff now contends that the ALJ improperly relied on objective evidence (or the lack thereof) to discount Plaintiff's subjective complaints regarding her fibromyalgia when assessing her RFC. Under the applicable regulations, in evaluating a claimant's reported symptoms, an ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. §§ 404.1529, 416.929. In Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Court of Appeals for the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic

techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95–96.

In Arakas, the Fourth Circuit further explained that some conditions, such as fibromyalgia, simply do not manifest themselves in objective signs and symptoms. Arakas, 983 F.3d at 97. As noted in Arakas, "A growing number of circuits have recognized fibromyalgia's unique nature and have accordingly held that ALJs may not discredit a claimant's subjective complaints regarding fibromyalgia symptoms based on a lack of objective evidence substantiating them." Id. The Fourth Circuit "join[ed] those circuits" and held that:

> ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence. Objective indicators such as normal clinical and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease. If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence substantiating the claimant's impairment. We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.

Id. at 97-98.

Plaintiff argues that the ALJ in the present case, like the ALJ in Arakas, improperly relied on objective evidence to discount Plaintiff's subjective statements in her testimony regarding her fibromyalgia. In the first hearing, Plaintiff testified "that she stopped working due to chronic pain" and "[s]he got to the point where she had trouble getting out of bed." (Pl.'s Br. [Doc. #13] at 4.) Plaintiff further explained that

Case 1:24-cv-00390-JEP    Document 16    Filed 03/31/26    Page 8 of 17

it feels like somebody is just taking my body and just swung it somewhere. I was in a car accident or something. Almost every morning you wake up, you feel like you've been in an accident. I can't walk for long because my legs will start hurting, or either my feet or ankles will swell up. I can't do much anymore. It's like my life's been stripped away.

(Tr. at 44.) Plaintiff testified that her fibromyalgia pain flares daily, that she can only walk thirty minutes before she experiences pain and swelling, and that she can only stand for about ten minutes at a time. (Tr. at 44-45.) When asked about how long she was comfortable sitting in a chair, Plaintiff said:

Not for long. I can't put any pressure on that, like, sitting straight on my bones. . . . A couple of minutes and then pain will start shooting down. I'll have to, like, choose one side to [sit] on. Like, my knees hurt. And it looks like I'm sitting right but I'm not. I'm sitting mainly on one side and leaning back.

(Tr. at 45.) Plaintiff went on to testify that if she has to bend she is "literally on the floor" and that she "can't bend over because [she gets] stuck" and that she has difficulty moving her hands because pain in her neck goes down to her hands. (Tr. at 46.)

At the second hearing, held on August 30, 2023, after the case was remanded from the Appeals Council pursuant to a remand from this Court, in responding to what kind of activities make her fibromyalgia-related pain worse, Plaintiff testified that

my daily activities; cleaning, vacuuming, sweeping, anything with type of motion work that I'm moving like with my back or anything, that will agitate it and it's like a domino effect. If I'm on my feet too long, that agitates it to a point where I can't walk. I rarely -- my legs start to swell up. I'll wake up in the morning, I'm already in pain from the fibromyalgia. So that's why I said, everything is very -- I can't pinpoint what agitates it most of the time or how it's going to be most of the time so it's harder, the first different -- it's hard to pinpoint what it could be or how it's going to be.

(Tr. at 2519.) When asked how long she could be on her feet before sitting down, Plaintiff responded: "If I push to 30 minutes or more, like I say, I can push but 30 minutes or after

9

that, my legs will start to give out. . . . I say I would have to sit and rest after that." (Tr. at 2519.) Plaintiff went on to explain that the most she could lift was "like a gallon of milk" without hurting herself and that she could sit for approximately 45 minutes without having to change positions. (Tr. at 2519-20.) Plaintiff testified that she had tried various forms of pain management including over the counter medications, prescription medications, meditation, and acupuncture. (Tr. at 2516.) She testified that she was eventually started on oxycodone, which was helpful but did not relieve her pain. (Tr. at 2516-17.) Plaintiff explained that her fibromyalgia caused pain all over her body. Specifically, Plaintiff testified that "[b]ecause of the fibromyalgia, my tender spots are in my shoulders but it radiates from all over. . . . I can swell up at any given moment with . . . because of the fibromyalgia." (Tr. at 2528-29.) Plaintiff further testified that swelling would be "in [her] leg—[her] body, all over. [She'll] just swell up out of nowhere." (Tr. at 2529.) Plaintiff concluded by testifying that:

> I understand that a lot of people don't understand that, the invisible pain aspect of everything and I understand that people can't sit there and judge somebody not knowing, not being in their shoes and not having to deal with it. It's just frustrating that, for all these years, I had to fight to get somebody to really finally believe me and struggling mentally and this is, this is a toll on somebody. It's nothing you can just describe away and measure and comment. It's just hard. That's all.

(Tr. at 2531.)

In considering Plaintiff's testimony regarding pain and limited mobility and setting the RFC, the ALJ stated that she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the <u>objective medical evidence</u> and other evidence." (Tr. at 2472 (emphasis added).) The ALJ summarized Plaintiff's testimony but found that Plaintiff's "medically determinable impairments could reasonably be expected

10

to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 2473.) In reaching her decision, the ALJ repeatedly refers to objective evidence. Upon reviewing all the testimony and the record as a whole, the ALJ concluded that:

> [Plaintiff] does have underlying medically determinable impairments that could and reasonably do cause some symptomology. However, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration or severity as to reduce [Plaintiff's RFC] as set forth above or to preclude all work activity on a continuing and regular basis. In this case, a careful review of the record does not document sufficient <u>objective medical evidence</u> to substantiate the severity of the pain and degree of functional limitations alleged by [Plaintiff]. The <u>objective medical evidence</u> fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the range of work described above.

> Despite [Plaintiff's] continuing chronic pain, the record contains little, in any, <u>objective signs of limited physical functioning</u>. Examining physicians and other medical professionals, including specialists such as neurologists and orthopedists, to emergency department professionals, to [Plaintiff's] primary care provider, have consistently noted the <u>lack of any apparent physical abnormalities</u> on medical examinations. [Plaintiff] has repeatedly been described as having a normal walking gait, having full muscle strength in all extremities, normal sensations and reflexes, and negative straight leg raising tests. The lone exception is from the April 27, 2017, consultative medical examination performed by Peter Morris, M.D., associated with [Plaintiff's] application for disability benefits.

(Tr. at 2489.) The ALJ then acknowledged that "[b]ecause the alleged severity of fibromyalgia symptoms may not be amenable to assessment by objective measures, per SSR 12-2p, other factors must be considered, including daily activities, medications or other treatments used to alleviate symptoms, and statements by others about [Plaintiff's] symptoms." (Tr. at 2489.) The ALJ then pointed to (1) the fact that Plaintiff's pain and mental impairments are linked,

Case 1:24-cv-00390-JEP    Document 16    Filed 03/31/26    Page 11 of 17

with evidence of bipolar disorder and depression and at least two psychiatric hospitalizations linked to suicidal ideations due to her severe pain, (2) the pattern of medication change followed by a few months of stabilization but then a lack of sustained efficacy and more medication changes with no sustained improvement in symptoms, (3) Plaintiff's use of opioids for pain management, and the fact that her pain levels remained high, (4) treatment records showing "no apparent physical or mental abnormalities other than occasional depressed mood or nervous or anxious affect," and (5) two occasions where Plaintiff "appeared to provide inaccurate information to medical professionals" regarding whether she was in fact suicidal at the time of her psychiatric hospital admission and whether she tried "to create an image of pain while ambulating." (Tr. at 2490.) As to most of these factors, it is not clear how they would undermine Plaintiff's statements regarding her pain and the fibromyalgia-related symptoms. Even more importantly, even this list still includes consideration of the lack of "apparent physical or mental abnormalities," again relying on a lack of objective medical evidence for fibromyalgia-related symptoms. The ALJ then continued the analysis by addressing Plaintiff's use of opioid pain medication and concluded that:

> regardless of whether the claimant does or does not have an opioid dependence impairment, the objective medical evidence supports the claimant being found with the above functional capacity. Rather, the factors set forth in SSR 16-3p support the residual functional capacity that has been found.

(Tr. at 2490 (emphasis added).)[5] The ALJ did not differentiate between Plaintiff's other impairments and her fibromyalgia in relying on the objective medical evidence. Thus, in

---

[5] The Court notes that though the ALJ's decision is replete with references to Plaintiff's prescription for and use of opioid medication, the ALJ did not undertake a substance abuse analysis regarding opioid use or rely on any medical determination of opioid abuse. Rather, the ALJ stated:
> Having the entirety of the claimant's medical treatment history dating back years for one overarching evaluation can lead to conclusions that may not have been knowable by a treating medical specialist.

12

assessing Plaintiff's fibromyalgia, the ALJ clearly and explicitly relied on objective medical evidence as one of the factors to discount Plaintiff's subjective complaints regarding her symptoms of fibromyalgia and regarding her combined impairments as a whole. Finally, in assessing the opinion evidence, the ALJ relied on her own findings that "[Plaintiff] continues to report high pain levels despite there being <u>no known pain generator</u> to examining medical professionals, her having <u>no apparent physical abnormalities</u> or limitations during physical examinations, and despite her being on the maximum allowable opioid pain medications combined with additionally trialed medications," and her own finding that "Plaintiff has limitations associated with chronic pain that have <u>no corresponding physical manifestations</u>." (Tr. at 2491-92, 2493.)[6] This completely ignores Plaintiff's testimony at the hearing that her fibromyalgia was the source of her pain.[7]

---

> While it may be a reasonable conclusion to find that [Plaintiff's] primary impairment is opioid dependency, with [Plaintiff's] body creating symptoms of pain to drive that dependency and prompting additional treatment seeking behaviors, no treating or examining medical professional has made such a diagnosis. As such, the undersigned notes that, regardless of whether [Plaintiff] does or does not have an opioid dependence impairment, the objective medical evidence supports [Plaintiff] being found with the above functional capacity.

(Tr. at 2490.) It is not clear what this analysis is intended to conclude. It appears that the ALJ may have been relying on her own lay opinion that Plaintiff's "primary impairment is opioid dependency, with [Plaintiff's] body creating symptoms of pain to drive that dependency and prompting additional treatment seeking behaviors" although of course "no treating or examining medical professional has made such a diagnosis." (Tr. at 2490). The ALJ provides this lay opinion even though Plaintiff's doctors continued to prescribe Plaintiff opioids and thus implicitly and explicitly concluded that the medications were medically appropriate and necessary to treat Plaintiff's pain. In addition, as noted above, the ALJ again relies on objective evidence to reach her opinion.

[6] The ALJ also found unpersuasive the mental health assessments because Plaintiff's "pain symptoms and mental health symptoms are inextricably linked and cannot be easily separated," including records reflecting a Global Assessment of Functioning ("GAF") of 30 "which corresponds to behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas," as well as a later GAF of 20, "which corresponds to some danger of hurting self of others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication." (Tr. at 2492.)

[7] The ALJ's summary of Plaintiff's treatment records included information regarding Plaintiff's fibromyalgia, including:
- Plaintiff's neurologist, Dr. John C. Morris, "evaluated [Plaintiff] and noted that [Plaintiff's] symptoms 'seem more consistent with a fibromyalgia-type syndrome'" and "[t]hree months later, Dr. Morris

13

Recently, after the briefing in this case had concluded, the Court of Appeals for the Fourth Circuit decided Hultz v. Bisignano, 162 F.4th 111, 115 (4th Cir. 2025), which reiterated that "[i]n Arakas, this Circuit held that ALJs may not rely on objective medical evidence even as just one of multiple factors to discount a claimant's subjective complaints regarding symptoms of fibromyalgia. . . . [F]ibromyalgia is a serious and mysterious condition, disproportionately affecting women, that our current science is incapable of observing through objective medical testing." Hultz, 162 F.4th at 115, 121. The Hultz court "reiterated that

---

diagnosed [Plaintiff] with fibromyalgia." (Tr. at 2466, citing Tr. at 607-610, 576-78.) Dr. Morris also noted that "there may also be a 'significant anxiety and bipolar component.'" (Tr. at 2478.)

- Plaintiff's treating physician and pain management specialist, Dr. Stanley Kincaid, confirmed that Plaintiff "does have positive trigger point tenderness that is the primary objective diagnostic sign" of fibromyalgia. (Tr. at 2466, citing Tr at 911-915.)

- Plaintiff had "3 psychiatric hospitalizations during the relevant time, each corresponding to episodes where [Plainitff] described feeling hopeless" and "[a] review of these records documents [Plaintiff's] mental health deteriorating secondary to her reported chronic pain." (Tr. at 2471.) During her psychiatric hospitalizations, "[t]reating clinicians noted that most conversations with [Plaintiff] returned to her pain." (Tr. at 2480.)

- Plaintiff's mental health provider, PA Aydt at The Neil Group, provided Plaintiff's medication management for "bipolar, anxiety, and depression disorder" and noted that Plaintiff "reported still feeling depressed mostly because of her pain" and "admitted to having some suicidal thoughts because of her pain." (Tr. at 2478-79, citing Tr. at 946-47, 948-52.) PA Aydt "opined that due to [Plaintiff's] bipolar disorder and generalized anxiety disorder, 'it is unlikely she would be able to maintain gainful employment.'" (Tr. at 2494, citing Tr. at 980.)

- Consultative Psychiatric Examiner Dr. Craig Hunt diagnosed Plaintiff with "major depressive disorder, recurrent, moderate to severe, with anxious distress and panic" and "some symptoms suggestive of bipolar disorder" and concluded that Plaintiff would have moderate to marked difficulty tolerating the stress associated with day-to-day work activity due to chronic pain and mental health concerns. (Tr. at 2475, 2492, citing Tr. at 410.)

- Consultative Examiner Dr. Peter Morris diagnosed Plaintiff with chronic pain, anxiety, depression, and bipolar disorder, and opined that due to chronic pain, Plaintiff could not stand or walk for more than 2 hours in a workday or lift over 10 pounds (Tr. at 2474, 2491, citing Tr. at 398-404.)

- Plaintiff's primary care provider, Nurse Practitioner Tiffany Gibson, opined that Plaintiff's health had declined and due to her impairments, including fibromyalgia, it was difficult for her to keep a job. (Tr. at 2493, citing Tr. at 979.)

14

claimants are 'entitled to rely exclusively on subjective evidence to prove that [their] symptoms were so continuous and/or severe that they prevented [the claimant] from working a full eight-hour day.'" Id. at 121 (citing Arakas, 983 F.3d at 96).

> We found that the ALJ in Arakas failed to adhere to this standard when he required that her subjective descriptions of her symptoms to be supported by objective medical evidence. Arakas, 983 F.3d at 96. We noted that this "type of legal error is particularly pronounced in a case involving fibromyalgia—a disease whose symptoms are entirely subjective." Id. (cleaned up). As both Arakas's rheumatologist and other circuit courts have observed, physical examinations of fibromyalgia patients did not produce clinical and laboratory abnormalities, and usually yielded a full range of motion, no joint swelling, and normal muscle strength and neurological reactions. Id. Accordingly, we held that "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." Id. at 97.

Hultz, 162 F.4th at 121. Notably, in Hultz, the Fourth Circuit found that "when discounting Ms. Hultz and her grandmother's testimony under the step four RFC analysis, the ALJ stated—in language that is nearly identical to the reversed ALJ decision in Arakas—that the ALJ did so because 'the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.' . . . This is in clear contravention of Arakas." Id. at 122. In the present case, the ALJ likewise reviewed Plaintiff's symptoms but held that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 2473.) This is the same language that the Fourth Circuit in Hultz found was "in clear contravention of Arakas." Hultz, 162 F.4th at 122.[8]

---

[8] In Hultz, the Fourth Circuit also considered the ALJ's analysis of the other factors, and found that:

As explained in another case from this District, <u>Arakas</u> explains that fibromyalgia is a "'unique' disease with symptoms [that] are entirely subjective." <u>Cowan v. Kijakazi</u>, No. 1:21CV196, 2022 WL 3446078, at *8 (M.D.N.C. Aug. 17, 2022) (quoting <u>Arakas</u>, 983 F.3d at 97), <u>report and recommendation adopted</u>, No. 1:21CV196, 2022 WL 17831951 (M.D.N.C. Sept. 21, 2022). In <u>Cowan</u>, the Court specifically considered a situation where, as here, the ALJ analyzed Plaintiff's fibromyalgia together with other impairments and "in doing so, relied on objective medical evidence to discount Plaintiff's subjective symptom reporting," and in that scenario "the Court "c[ould] not rule out the possibility that the ALJ impermissibly relied on objective evidence, even as just one factor, in discounting the intensity, persistence, and limiting effects of [her] subjective complaints of fibromyalgia pain and fatigue in violation of <u>Arakas</u>." <u>Cowan</u>, 2022 WL 3446078, at *8; <u>see also</u> <u>Crystal H. v. O'Malley</u>, No. 1:23CV733, 2024 WL 3677338 at *7 (M.D.N.C. Aug. 6, 2024) (collecting cases).

Similarly, in the present case, the ALJ clearly and repeatedly relied on a lack of objective evidence to find that Plaintiff was not disabled. While the ALJ did acknowledge Plaintiff's testimony, she concluded that "[a]s for the [Plaintiff's] statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the medical findings do not support the existence of limitations greater than the above listed residual functional capacity." (Tr. at 2473.) In the circumstances, given the Fourth Circuit's direction

---

The ALJ discounted [the plaintiff's and her grandmother's testimony] without adequate explanation. And this Court cannot identify evidence in the record that contradicts Ms. Hultz's testimony about her conditions. Her off-and-on treatment and taking of medications, her occasional ability to engage in daily activity, and even her marked improvement on her other medical issues all remain consistent with debilitating fibromyalgia symptoms.

<u>Hultz</u>, 162 F.4th at 124.

in a similar scenario in <u>Hultz</u>, the Court concludes that remand is necessary so that these issues can be addressed by the ALJ under <u>Arakas</u> and the recent decision in <u>Hultz</u>.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Order. To this extent, Defendant's Dispositive Brief [Doc. #14] should be DENIED, and Plaintiff's Dispositive Brief [Doc. #13] should be GRANTED. However, to the extent that Plaintiff's Brief seeks an immediate award of benefits, it is DENIED.

This, the 31st day of March, 2026.

Joi Elizabeth Peake
United States Magistrate Judge

17